# Case No. 6,880.

## HUNNEWELL v. TABER.

[2 Spr. 1.] [1]

District Court, D. Massachusetts. Sept., 1854.

BILL OF LADING—LIABILITY OF CARRIER FOR LOSS UNDER.

1. Under a bill of lading containing a stipulation that the oil, which was part of the cargo, should be wet twice a week, and also the clause "not accountable for leakage or stowage," the carrier is liable for loss of oil by leakage caused by the casks not being properly wet.

2. It seems that the carrier is also liable, under such a bill of lading, for leakage occasioned by want of reasonable care of the cargo on the voyage.

The respondents in this case were agents of the ship Good Return, and shipped a large cargo of oil on board the Eliza Warwick, the libellants' ship, at Honolulu, in the spring of 1853. This oil was mostly stowed aft of the main hatch in the lower hold. Upon its delivery at New Bedford, it was found that there had been a loss by leakage, to the value of between three and four thousand dollars. The respondents contended that the libellants should account to them for this extraordinary loss; and resisted payment of the freight money, except an amount tendered by them as the difference between this and their loss through the carrier's fault.

C. P. Curtis and C. P. Curtis, Jr., for libellants.

1 [Reported by John Lathrop, Esq., and here reprinted by permission.]

T. D. Eliot and R. C. Pitman, for respondents.

SPRAGUE, District Judge. This is a libel for freight. It is not disputed that the ship performed her voyage and earned her freight; but the question made is, whether certain deductions ought not to be made for loss of oil which the respondents say is attributable to causes for which the libellants are responsible.

The bill of lading in this case is in the ordinary form, except that in the body of it is the stipulation, "oil to be wet twice a week," and that in the margin is the clause "not accountable for leakage or stowage." The respondents insist that the oil was not wet twice a week, that the ship was not seaworthy, and that proper attention was not bestowed upon the oil in other respects than the omission to properly wet it.

First, as to the wetting. The bill of lading does not say how the oil is to be wet; but the construction must be that it is to be wet in such a manner as reasonably to accomplish the object of wetting, which is to prevent leakage by shrinkage of the casks. The main ground of respondents in regard to the wetting is, that the means were inadequate with which the ship was furnished. It is proved clearly, that the usual manner of wetting oil on board whalemen, and, so far as may be inferred from the absence of testimony, in other vessels, is by having long hose which is carried so as to pour the water over all parts of the cargo;—a man carrying it into the wings of the vessel as well as towards the extremities. In the present instance, instead of such a hose, a short hose, which, after going into the lower hold, had but two or three feet to spare, was used, but with a force-pump which would send the water as far as the casks reached. The question is, whether this apparatus in fact answered the purpose. The respondents say it did not; and contend, first, that it appears from the evidence that their oil was not wet; and, second, that it was impracticable to have wet it with such means.

Several experts have been called, experienced whaling captains, who all say that it was impracticable. The question was fairly put to them by the counsel for respondents, whether with such a hose, even if the force-pump would send the water to the end of the ship, the respondents' cargo could have been properly wet. They all say that it could not, and this evidence is uncontradicted. The hose was produced in court, and the opinion formed from actual inspection. Such testimony is entitled to great weight; still it is not conclusive, and the court ought to look into the reason of the opinion. The reason assigned is that the intervention of the beams and carlings of the ship and the tops of projecting casks would prevent the water reaching parts of the cargo. That seems to me a satisfactory reason. Owners of ships generally desire full stowage; and, especially with so buoyant a cargo as that of oil, casks would naturally fill all the space practicable.

This cargo was stowed aft in the lower hold. In order to wet it, the hose was carried down the main hatch, and at the after-hatch there was only a small place for a boy to get down. To water the cargo there, the boy got between decks and reached down and pointed the hose. There is no evidence that he had a light, and it would naturally be quite dark there. Stooping down on the casks, just able to squeeze himself through the hatchway, the hatch not taken off because cargo was on it, but only some planks ripped off, he had to direct the hose as best he could. It was somewhat like pointing a pistol, which in a small, low space must go with great accuracy not to strike by the way. The whalemen all say it was not practicable. It is also to be observed that only the boy was sent, nobody overseeing him; and it is not to be expected that he would, under the circumstances, guide the hose with much accuracy. The counsel for the libellants suggests that the water was all thrown among the casks. But the difficulty is that it did not fall in the right place.

Now the facts appearing when the oil was broken out corroborate the respondents' theory. That is to say, Captain Gardner and others state results which the experts say would follow from such a method of wetting. "Aft, the oil leaked most,"—"grew worse as you went on," is the language. To be sure, the leakage was not uniform, and, indeed, it would not have been if the oil was not wet at all. This is illustrated by the condition of the casks under the bone, for which the libellants admit their liability. One of these four casks was full, one nearly so, while the others were nearly or quite empty. It is clear these casks were none of them wet; and yet from some cause, perhaps we cannot satisfactorily ascertain what, there was this difference. The testimony of all the witnesses who examined the cargo of respondents at the home port, at the time of breaking out, is that the beams and knees of the ship, and the casks themselves, were dry, and the hoops loose, indicating shrinkage of casks, and that it seemed attributable to want of wetting. It is evident that there was a loss of oil for want of proper wetting. I have no doubt of this since hearing the evidence.

The question which I have had to consider more especially is, whether there is any concurrent cause for the loss for which the carrier is not liable, and which may diminish his responsibility for a part of it. The carrier insists that the oil was badly stowed. The bill of lading, as I have said, contains the clause "not accountable for stowage." There are two questions of fact to be examined: first, whether the stowage was good or bad; and second, whether any loss is to be attributable to the stowage. The respondents say their oil was well stowed by their agents;

and that, if any loss arises from stowage, it was from displacement by the working of the ship, and want of proper care of the oil when thus adrift. As to the stowage, the direct evidence, except that of Watson the master, and perhaps, to some extent, of the boy Cornell, is all one way. The officers of the Good Return who stowed the oil at Honolulu did it under a sense of responsibility. They were interested in its safety, and must, from their station, be presumed to be competent whalemen. The mate in his deposition, and the second and third mates by libellants' admission that if present they would so testify, all say that the oil was well stowed, in the ordinary manner, that is, stowed properly. These witnesses would naturally have a bias to justify their own acts, and, so far as this consideration goes, it must detract from their testimony. I give a good deal of weight to the testimony of Captain Cox. He was stowing the cargo of the Magnolia at the same time, and in close proximity to the cargo of respondents; was in the hold superintending personally, and saw the manner of stowage aft. Captain Watson, having been disabled by an accident, had requested Cox to have a general oversight over matters. This would naturally lead him to take better notice than otherwise. He appeared to be a competent and intelligent witness, and he says the oil of the respondents was well stowed. I may also add, though the consideration belongs to the branch of the case I have already disposed of, that, as to the practicability of wetting, Captain Cox, when he says their hose would not answer, speaks from knowledge of how that cargo was actually stowed. The evidence of all the home witnesses, coopers and stevedores, is in the same direction. Even Captain Gardner—called on the discharge of the cargo by Captain Watson, to examine its condition, as a competent person for that purpose—testifies that the oil was well stowed.

There is no contradiction on this point, except from some of the witnesses on board the carrier vessel, who say the oil was not well stowed,—that improper spaces intervened. Captain Watson says he noticed such appearances between decks. The suggestion made by the respondents is, that to make close stowage, certain small casks called breakers are put between the large ones, and, being entirely out of sight, might give the appearance testified to. If improper spaces had in fact been left between the casks, Captain Gardner and the stevedores would have seen this from the size of the casks and the space occupied. But all of them say the oil was well stowed. I think the respondents' suggestion must be adopted. At all events the preponderance of evidence is very strong that the cargo was well stowed.

The evidence is that the cargo got adrift. The libellants say it was from want of good stowage. It must have occurred from this cause or from perils of the sea, or from un-

seaworthiness of the vessel I do not think it is made out that the vessel was unseaworthy. No person has been called who gives it as his opinion that she was so. The vessel was open for examination at New Bedford on her arrival, and the respondents might have proved this, if it were so in fact. The vessel worked and leaked somewhat. The evidence is not, however, carried far enough to establish her unseaworthiness. But, being a weak vessel, this may have contributed to the oil getting adrift. If the oil was adrift through perils of the sea, the carrier would not be responsible, except to the extent, and in the manner, I will indicate. The libellants contend, as matter of law, that they are not responsible for leakage so caused, even if it arose from their own neglect; that they are not responsible under this contract for leakage arising from their ship's state, or from any neglect to care for the oil, provided they complied with the stipulation to wet twice a week. By the general rules of the maritime law, if perils of the sea have loosened a cargo, it is the duty of officers and crew to take care of the cargo as well as they reasonably can,—not to stand idle by. They are to exercise reasonable care. The question is, how is it under this bill of lading? I think the same rule must exist. I see nothing to exempt the carriers from this. They are to obviate the dangers of the sea as well as they can, and must use reasonable diligence to remedy any mischief that occurs. If for example they see a cask leaking, they must use reasonable care to stop the leak.

I have said the vessel was not unseaworthy. I will add that the captain and crew, it would appear, used diligence according to their means, in the care of the cargo. I am not satisfied that any loss occurred from oil getting adrift. If it did, the captain and crew in point of fact bestowed all the attention they ought upon it. They did the best they could. But the owners allowed other cargo to be so stowed as to interfere with this. There was no access to the lower hold. After the vessel had been at sea some time, the crew heard a noise there as of the working of the cargo. They became alarmed. They then had to cut a hole through the storeroom or steerage. This was because the cargo was so placed at the after-hatch by other shippers as to leave too little room to get down there. The cabin floor was also covered over with bone, and they could not get down through the run scuttle. No proper means of access were left to the respondents' oil. This also bears upon the other point, as to the wetting. They waited till they were alarmed before this hole was cut.

The remaining question is, whether any actual loss occurred from the cargo being adrift. The evidence is that no casks were found stove, no chines broken, and, as Captain Gardner testifies, not even chafed, upon the arrival of the cargo at New Bedford. In conclusion, I am not satisfied that any loss

arose from the cargo getting adrift. If there were, the question would be whether it was the fault of the carrier or fault of the stowage.

I think the loss is to be wholly attributable to not wetting the oil properly; and for this the carrier is responsible. From the evidence the loss must be confined to the cargo in the lower hold, and the case will be sent to an assessor to report how much of the respondents' oil in the lower hold was lost by leakage, and the value of the oil when the residue was delivered, and what is the usual and average loss of oil by leakage in such a voyage, when properly wet down twice a week.

See Phillips v. Clark, 5 C. B. (N. S.; Am. Ed.) 881, 2 C. B. (N. S.) 156; Ohrloff v. Briscall, L. R. 1 P. C. 231.